UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STIMSON LUMBER COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>COEUR D'ALENE TRIBE,<br><br>    Defendant. | Case No. 2:22-cv-00089-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiff Stimson Lumber Company's Motion for Preliminary Injunction. Dkt. 3. On March 17, 2022, the Court held oral argument and took the motion under advisement. The Court also has before it Defendant's First Motion to Dismiss for Lack of Jurisdiction ("Motion to Dismiss"), which was filed after oral argument. Dkt. 35. Upon review, and for the reasons set forth below, the Court GRANTS the Motion for Preliminary Injunction. Because of the complicated nature of the Motion to Dismiss, the Court will rule on the Motion to Dismiss after oral argument is held. Although some of the arguments raised in the Motion to Dismiss duplicate those presented in the Motion for Preliminary Injunction, the Court declines to delay ruling on the Motion for Preliminary Injunction because, as of now, the parties have been acting under a verbal injunction the Court issued at the preliminary injunction hearing, and the parties are entitled

to an official order on the matter.[1]

## II. BACKGROUND

On May 31, 2000, a third party, TOBD, Inc., entered into an Agreement[2] with the Defendant, Coeur D'Alene Tribe (the "Tribe"),[3] under which TOBD, Inc. would lease certain land and assets from the Tribe and construct and operate a sawmill (the "Mill"). Dkt. 1, ¶ 8. TOBD, Inc. subsequently made the required investment and began operating the Mill. *Id*. at ¶ 9. TOBD's rights under the Agreement were later acquired by Plummer Forest Products (*id*.), which were then acquired in 2006 by the Plaintiff, Stimson Lumber Company ("Stimson"). *Id*. at ¶ 10. Notably, the Agreement contained a Purchase Option under which Stimson could, after a certain period of time, purchase the Mill and certain other assets. Dkt. 6-3, at 7, Section 14.1. To exercise this Purchase Option, Stimson was, *inter alia*, required to give sixty days written notice. *Id*. Through various pre-arranged and automatic renewals, the full term of the Agreement did not officially expire until June 1, 2020. Dkt. 1 at ¶ 13.

A few days before the expiration, on May 27, 2020, Dan McFall, the Chief Operating Officer of Stimson Lumber Company, emailed the Tribe, claiming that Stimson

---

[1] The Court spent significant time reviewing the Motion to Dismiss and had hoped to resolve both motions simultaneously. However, the complicated factual background of the situation made this impossible.

[2] The Lease and Option Agreement is alternately "referred to as the 'Lease' or the 'Agreement.'" Dkt. 6-2, at 25. This Court will refer to it similarly.

[3] The Court understands that the parties are currently disputing whether this Agreement was entered into by the Tribe or by the Tribe's corporation. However, for simplicity's sake, the Court will refer to the signing entity as "the Tribe." This is not meant to be a preview of the Court's decision, nor should it be construed as a holding on the matter.

had been unsuccessfully trying to contact the Tribe for a few months to extend the Agreement for a year. Dkt. 6-4, at 2. McFall also submitted notice that Stimson was exercising its Purchase Option. *Id*.

Eric Van Orden, legal counsel for the Tribe, responded the next day. Van Orden indicated that the May 27th letter was the first written communication he had received regarding the expiration of the Agreement. *Id*. at 6. Van Orden explained that the terms of the Agreement renewal could not be discussed until after June 8, 2020, when the new Tribal Council would be sworn in. *Id*. Van Orden stated: "I understand this may create a holdover situation under the Lease so the Tribe will not expect a rent payment for the month of June 2020, until we can meet and discuss the terms of a new lease agreement." *Id*.

On July 1, 2020, Peter Smith IV, outside counsel for the Tribe, wrote to Stimson and stated that Stimson did not provide timely notice to exercise its Purchase Option because notice was due on April 1, 2020, and Stimson had not exercised the Purchase Option until May 27, 2020. *Id*. at 9. Additionally, Smith wrote: "At this time, the Tribe declines to extend the term of the Lease. As such, beginning on June 1, 2020, *Stimson is a holdover tenant of the Property*." *Id*. (emphasis added). After offering to negotiate the new lease agreement, Smith requested that Stimson pay the excused June rent and send payment for July's rent. *Id*.

However, the negotiations broke down. Stimson claims that the Tribe's proposed extension would remove the Purchase Option and require Stimson to sell approximately 41,000 acres of timberlands to the Tribe. Dkt. 1 at ¶ 28. On January 25, 2022 (after twenty months of holdover rent payments), the Tribe requested that Stimson cease sending its

MEMORANDUM DECISION AND ORDER - 3

monthly rent payments and attempted to return Stimson's rent payments. Stimson refused the returned payments and sent the check back to the Tribe.

On February 23, 2022, Chief J. Allan, Chairman of the Tribe, informed Stimson that because the Agreement expired on May 31, 2020, "Stimson is in trespass and has been trespassing since expiration of the Lease on May 31, 2020." *Id*. at 11. Chief Allan ordered Stimson to vacate the Premises immediately and threatened legal action if Stimson was not out by March 31, 2022. *Id*. Shortly thereafter, Stimson brought this action against the Tribe, raising claims for breach of contract, unjust enrichment, and conversion. Dkt. 1. Stimson seeks specific performance, damages, and declaratory and injunctive relief. *Id*. The claims for unjust enrichment and conversion were withdrawn by Stimson in its Amended Complaint. Dkt. 26.

On March 2, 2022, Stimson filed a Motion for Temporary Restraining Order and Motion for Preliminary Injunction asking that the Court enjoin the Tribe from terminating the Agreement and evicting Stimson. Dkt. 3, at 1. The Court denied the Motion for Temporary Restraining Order on March 3, 2022, and scheduled a hearing regarding the instant Motion for Preliminary Injunction. Without notice to the Court, Stimson inopportunely filed hundreds of pages of supplemental documents relating to the Tribe's corporate status the night before the hearing, after business hours. Dkt. 30. The Court refrained from ruling on the Motion for Preliminary Injunction until the Tribe had time to file its own supplemental briefing, and Stimson, as plaintiff, was given a chance to file a final sur-reply. However, before Stimson filed its final sur-reply, the Tribe filed a Motion to Dismiss, which elaborated on several of the arguments regarding subject matter

MEMORANDUM DECISION AND ORDER - 4

jurisdiction that it had raised in its earlier Response to the Motion for Preliminary Injunction.[4] Dkt. 35. As explained above, the Court will decide the Motion for Preliminary Injunction now and will issue a subsequent decision on the Motion to Dismiss so that the parties do not need to continue relying on the verbal injunction the Court temporarily entered at the hearing.

### III. SOVEREIGN IMMUNITY

As a threshold matter, the Court will first address the issue of sovereign immunity raised by the Tribe. Stimson claims the Court has subject matter jurisdiction because the requirements for diversity jurisdiction have been met. Dkt. 1, ¶ 4. The Tribe contends that the Court cannot hear the case because "the Tribe has not expressly waived its sovereign immunity for Stimson's claims." Dkt. 25, at 7.[5] Although the Court will not yet rule on whether the Tribe is a corporation (which will most likely determine whether the Court has diversity jurisdiction), the Court will rule on the question of sovereign immunity, since the Tribe's purported sovereign immunity would bar Stimson's suit.

Tribes and Tribal governmental entities enjoy common-law sovereign immunity from suit. *Stock West Corp. v. Lujan*, 982 F.2d 1389, 1398 (9th Cir. 1993). Therefore,

---

[4] During the hearing on the preliminary injunction, the Court specifically instructed the Tribe that Stimson was to have the final word on the issue of subject matter jurisdiction, which the Tribe raised as a defense to Stimson's Motion for Preliminary Injunction. As such, the Tribe's subsequent Motion to Dismiss based on the Court's purported lack of subject matter jurisdiction needlessly duplicated the proceedings and delayed resolution of the jurisdictional issue.

[5] The Court acknowledges the Tribe has also claimed that, as an Indian tribe, "it is stateless for jurisdictional purposes and its presence destroys diversity." Dkt. 25, at 6. To once again reiterate so there is no confusion, the Court is neither ruling on, nor disregarding, this argument. It is rather preserving this argument for a future ruling after oral argument on the Motion to Dismiss. The Court is only taking this uncommon step so that it may properly and appropriately rule on subject-matter jurisdiction without leaving the Motion for Preliminary Injunction unresolved.

MEMORANDUM DECISION AND ORDER - 5

absent a waiver of sovereign immunity, a plaintiff cannot sue a Tribe or a Tribal entity in federal court. *See Kennerly v. United States*, 721 F.2d 1252, 1258–59 (9th Cir. 1983) (holding that, because "there has been no express waiver [of sovereign immunity] or consent to suit, nor any congressional authorization for such a suit against the Tribe, [the federal courts] are without jurisdiction").

Here, the Agreement does contain a limited waiver of immunity. Section 19.1 states:

> Lessor acknowledges and agrees that in entering into this Agreement, it may incur obligations to Lessee, and Lessee's successors and assigns, and may become liable to these parties for injunctive or declaratory relief or for damages. Lessor further acknowledges that Lessee would not enter into this Agreement with Lessor if Lessor could defeat or hinder enforcement against them of the rights granted to Lessee by claiming sovereign immunity or asserting any other attribute of tribal sovereignty that may be applicable. Lessor hereby consents to suit, arbitration, enforcement and collection of judgments, awards, injunctions and declaratory judgments as to any obligations arising out of this Agreement. Lessor hereby expressly waives any claim or assertion of sovereign immunity from suit in actions to interpret or enforce any provision of or rights granted in this Agreement, to seek judgment for monetary obligations arising under this Agreement, and to enforce and collect any judgment in any suit or arbitration concerning or arising out of this Agreement in the manner specified in paragraph 19.3 below.

Dkt. 6-3, at 14.

The Tribe argues that because the Agreement is no longer in effect, and "does not provide that this waiver survives," the aforementioned waiver "is inoperable." Dkt. 25, at 7. The Tribe's argument is somewhat circular. In essence, the Tribe is arguing that because the Agreement is inoperable, the Court has no jurisdiction to determine whether the Agreement is inoperable. Further, based on the plain language of the waiver, it is clear that the Tribe *has* waived its immunity for the purposes of this lawsuit.

MEMORANDUM DECISION AND ORDER - 6

First, there is no temporal deadline for the waiver to expire. The waiver is for any "suit, arbitration, enforcement and collection . . . as to *any* obligations arising out of this Agreement." Dkt. 6-3, at 15. The waiver is not limited to suits brought while the Agreement is in effect. Rather, it is for "any" obligation arising out of the Agreement. *Id.* Thus, even if the Court holds that the Agreement has expired, the waiver of sovereign immunity for disputes arising out of the Agreement is still valid.[6]

Second, the Tribe acknowledged in the Agreement "that Lessee would not enter into this Agreement with Lessor if Lessor could defeat or hinder enforcement against them of the rights granted to Lessee by claiming sovereign immunity." *Id.* With this acknowledgement, the Tribe essentially agreed that it would not raise the sovereign immunity argument it asserts here against Stimson or its predecessors.

Third, the language in Section 19.3.2 indicates an intent to waive sovereign immunity. Section 19.3.2, which concerns jurisdiction and venue, states:

> The Parties agree that any disputes concerning, relating to or arising out of this Agreement present a federal question. With respect to any Proceeding each Party irrevocably submits to the exclusive jurisdiction of the United States District Court for the District of Idaho. Each Party hereby irrevocably waives any objections which it may have at any time to the venue of any Proceedings brought in the United States District Court for the District of Idaho, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court should not exercise its jurisdiction or should defer to some other judicial or administrative tribunal, whether federal, state or tribal.

Dkt. 6-3, at 15. Thus, under the plain language of the Agreement, the parties agreed to this

---

[6] Furthermore, the Agreement likely has *not* expired because the Tribe made Stimson a holdover tenant, and thus extended the Agreement. *See infra* Part IV, Section C.

MEMORANDUM DECISION AND ORDER - 7

Court's jurisdiction, and even agreed to construe the lawsuit as a federal question in order to submit to this Court's jurisdiction. While the case was brought pursuant to 28 U.S.C. § 1332, and not 28 U.S.C. § 1331,[7] the Tribe's explicit agreement to submit to the jurisdiction of this Court reinforces the Court's conclusion that the Tribe waived its sovereign immunity.

Finally, the Supreme Court has held that less explicit language, such as an arbitration clause, can waive sovereign immunity. In *C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, the Supreme Court dealt with the question of whether Potawatomi Nation had waived its sovereign immunity in a form contract with the plaintiff. 532 U.S. 411, 414 (2001). Notably, the Potowatomi Tribe had proposed the form contract and the plaintiff had accepted it. *Id.* The form contract contained an arbitration clause that "expressly agreed to arbitrate disputes with [plaintiff] relating to the contract, to the governance of Oklahoma law, and to the enforcement of arbitral awards 'in any court having jurisdiction therefore.'" *Id.* at 415. The Supreme Court held that the arbitration clause unequivocally waived the Tribe's sovereign immunity. *Id.* at 422. In so holding, the Supreme Court explained, "[u]nder the law of the United States . . . an agreement to arbitrate is a waiver of immunity from jurisdiction in . . . an action to enforce an arbitral award rendered pursuant to the agreement. . . ." *Id.* at 422, n. 3 (quoting Restatement (Third) Of The Foreign Relations Law Of The United States § 456(2)(b)(ii) (1987)). Notably, the Supreme Court further held Potawatomi Nation was a "federally recognized

---

[7] The Court is not deciding that it has federal question jurisdiction over the case but is rather using this as intent of the waiver.

Indian Tribe," not a corporation. Its status as a Tribe (i.e., not a corporation) did not bar it from waiving its sovereign immunity.

Here, the Tribe has signed an Agreement with even more explicit language than the arbitration clause at issue in *C&L Enterprises, Inc*. What's more, the Agreement also contains an arbitration clause. Dkt. 6-3, at 19.3.3. Given this, the Tribe has waived its sovereign immunity. *C&L Enterprises, Inc.*, 532 U.S. at 422.

For the foregoing reasons, the Court holds that the Tribe waived its sovereign immunity for purposes of this suit, regardless of whether the Tribe entered into the Agreement as a federally recognized Indian Tribe or as a corporation.

## IV. PRELIMINARY INJUNCTION

### A. Legal Standard

A preliminary injunction's purpose is to prevent irreparable harm that occurs before a court can render a decision on the merits. Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (cleaned up). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Id.* at 20.

Although a plaintiff seeking injunctive relief must satisfy all four of the *Winter* factors, the Ninth Circuit has expressly affirmed a "sliding scale" approach post-*Winter*. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this

approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135 (citations omitted).

### B. Purchase Option

Before turning to the merits of the Motion, the Court first provides context for the relief Stimson seeks. Stimson requests that the Court preliminarily enjoin the Tribe from terminating the Agreement, from evicting Stimson, and from interfering with Stimson's possession and operation of the Mill. As such, the issue before the Court is whether Stimson could prevail on a claim that the Purchase Option was properly exercised.

There are two critical parts of the Agreement. First, the Purchase Option in Section 14.1(a)–(c), which states:

> Lessor grants to Lessee during the Lease Term and all Renewal Terms the sole, exclusive, and irrevocable right and option ("Option") to purchase the Leased Assets (including the Premises and Equipment) in accordance with the following terms and conditions:
> (a) Such Option shall be exercised, if at all, by written notice given by Lessee to Lessor ("Exercise Notice") not less than sixty (60) days prior to the termination of the Lease Term or any Renewal Term. The date the Exercise Notice is given shall be referred to as the "Exercise Date."
> (b) Upon exercise of this Option, Lessee shall be obligated to purchase the Leased Assets described in the Exercise Notice from Lessor, and Lessor shall be obligated to sell these Leased Assets to lessee, for the price set forth below, and in the manner stated in this Agreement.
> (c) The entering into this Lease, and payment of rent hereunder by Lessee, and the mutual covenants of Lessor and Lessee under this Agreement, and other good and sufficient consideration, shall be deemed adequate consideration for this Option, and Lessee shall be required to pay no other or additional fee or consideration or any kind to maintain this Option; provided (i) all rentals paid to Lessor

> hereunder shall be credited to the purchase price for the Leased Assets as set forth below; and (ii) this Option shall not terminate or expire in the event of any non-payment of rent by Lessee, but shall terminate only upon (1) the exercise of all Options granted hereunder by Lessee in accordance with the terms hereof or (2) any termination of this Agreement.

Dkt. 6-3, at 7–8. The second critical section is the Holdover Clause in Section 21, which states:

> If Lessee should occupy the Premises with the consent of Lessor after the expiration of this Agreement, and rent is accepted from lessee, such occupancy and payment shall be construed as an extension of this Agreement for a month-to-month tenancy from the date of expiration, unless other terms of such extension are endorsed in writing and signed by the parties hereto; provided Lessee's entry on the Premises for the purpose of removing Lessee's Property pursuant to paragraph 9.2 above shall not be deemed a holdover occupancy.

*Id.* at 22. The interplay between these two sections is what the case rests upon.

### C. Likelihood of Success on the Merits

A party seeking a preliminary injunction must establish a likelihood of success on the merits. *Winter*, 555 U.S. at 20. Stimson claims that it is likely to succeed on the merits because, under the express terms of the Purchase Option and the Holdover Clause, it had not run out of time to exercise the Purchase Option at the time it did so. The Tribe, on the other hand, claims that under the plain language of Section 14.1(a), Stimson did not timely exercise the Purchase Option and its attempt to exercise the Purchase Option was conditional.[8]

---

[8] The Tribe also claims that Stimson has not shown it will likely succeed on its conversion and unjust enrichment claims. That may be so. However, Stimson brought several other claims, and a failure to prove those claims would not doom Stimson's case. In any event, the point is moot because Stimson dropped these claims in its Amended Complaint. Dkt. 26.

MEMORANDUM DECISION AND ORDER - 11

Stimson did not notify the Tribe of its intent to exercise the Purchase Option sixty days before the last Renewal Term expired. On its face, this clearly violates the requirement in Section 14.1(a) that the Purchase Option must be exercised sixty days "prior to the termination of the Lease Term or any Renewal Term." However, Section 14.1(c) modifies this language, as it clearly states that the Purchase Option shall "terminate only upon (1) the exercise of all Options granted hereunder by Lessee in accordance with the terms hereof or (2) any termination of this Agreement." As such, the Purchase Option lasts for the life of the Agreement, not the life of the Lease Term or any pre-arranged Renewal Term. Upholding the Tribe's claim that the Purchase Option only lasts for the life of the Lease Term or the Renewal Terms would render Section 14.1(c) essentially meaningless, and as such, is an interpretation the Court cannot endorse at this juncture.[9] *See* Restatement (Second) of Contracts § 203(a) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

Thus, the question is whether the Agreement was terminated, not whether the Renewal Term or Lease Term had expired at the time Stimson exercised the Purchase Option. Section 21 clearly states that "occupancy and payment shall be construed as an extension of this Agreement for a month-to-month tenancy from the date of expiration."

---

[9] Further digging into the Tribe's argument, the Tribe is asking the Court to read into 14.1(a) the implicit statement that the Purchase Option expires sixty days before the Lease Term or Renewal Terms end. The Court does not need to read implicit expiration terms into 14.1(a) because they are *explicitly* contained in 14.1(c). The Tribe's distinction that 14.1(a) is about the natural expiration of the Purchase Option and 14.1(c) is about the forced expiration is dubious at best, and is not supported by the plain language of the Agreement.

MEMORANDUM DECISION AND ORDER - 12

Thus, the holdover tenancy by Stimson, *whose status as a holdover tenant was explicitly acknowledged by the Tribe, which accepted payment for almost two years for the holdover tenancy*, extended the term of the Agreement, meaning the Purchase Option was likely properly exercised. While the Tribe did signal that it believed the Purchase Option was no longer valid, the Tribe nevertheless created a holdover tenancy and prolonged the Agreement. The Tribe's declaration that the Purchase Option was no longer valid was not sufficient to alter the Agreement, as Section 21 clearly states that the Agreement *as it currently exists*, continues in force "unless other terms of such extension are endorsed in writing and signed by the parties hereto." As there were no agreed upon terms of extension that both parties signed, the entire Agreement as it existed as of the end of the last Renewal Term controlled the holdover tenancy.

The Tribe claims that the Purchase Option expired when the last Renewal Term ended, arguing that courts "refuse to allow an option to purchase to be exercised after expiration of the original lease." Dkt. 25, at 11 (citing *Lewiston Pre-Mix Concrete, Inc. v. Rohde*, 718 P.2d 551, 556 (Idaho Ct. App. 1985)). However, *Lewiston* is clearly distinguishable. In *Lewiston*, the parties did not have a written agreement governing their relationship after the lease expired. In that case, the term of the lease expired, with no holdover clause, and the tenant simply stayed and paid rent. Under such circumstances, the court determined that only the terms relating to a landlord-tenant relationship carried over. Here, the parties specifically agreed to what terms would carry over in the event a holdover tenancy began—all of the terms of the Agreement, *which included the Purchase Option*, carried over into the holdover tenancy.

MEMORANDUM DECISION AND ORDER - 13

The Tribe also claims that Stimson did not exercise the Purchase Option because its attempt to do so was conditional. The Tribe points to potentially conditional language in McFall's May 27th letter,[10] as well as to Stimson's alleged failure to move forward with the purchase, as evidence that Stimson did not actually exercise the Purchase Option. The Tribe also claims that Stimson's conduct as a holdover tenant for two years indicates that Stimson had not intended to exercise the Purchase Option but only to renegotiate the lease and "has only now claimed it exercised the option after negotiations for a new lease agreement failed." Dkt. 25, at 13. Stimson counters that the Tribe's conduct stopped Stimson from properly exercising the Purchase Option.[11] Here, both parties have offered reasonable explanations for why (and why not) such an action was unequivocal. As such, this becomes a question of fact, which preliminary injunctions are not particularly designed to determine.

At this stage of the proceedings, the Agreement's language clearly supports Stimson's claim that the Purchase Option survived into the holdover tenancy and was thus timely exercised. Even though the *facts* may later support the Tribe's claim that the Purchase Option was not exercised, Stimson has a clear likelihood of success based upon the Court's interpretation of the Agreement. Although heavily contested, this factor weighs

---

[10] The Tribe points to Stimson's stated willingness "to extend the Lease for another year at the current monthly rental rate, and defer until at least early 2021 exercising the option . . . ." and to Stimson's statement that it was submitting the notice "as a precautionary measure, and in the alternative to extending the Lease." Dkt. 6-4, at 2.

[11] Stimson claims that its "exercise of the Option triggered a series of duties on the part of the Tribe . . . none of which the Tribe performed." Dkt. 27, at 7. Additionally, Stimson claims that the Tribe delayed acting on the Purchase Option because of the Covid-19 pandemic. *Id*.

MEMORANDUM DECISION AND ORDER - 14

in Stimson's favor.

### D. Likelihood of Irreparable Injury

A party seeking a preliminary injunction must establish likely irreparable harm in the absence of a preliminary injunction. *Winter*, 555 U.S. at 20. The Tribe claims that Stimson has not offered concrete evidence adequate to prove the likelihood of irreparable injury. The Tribe put forward several cases supporting its position. However, each case rises and falls on facts easily distinguishable from the instant case.[12] Here, based on the affidavits and the facts that both parties can agree upon (namely, that Stimson and its employees operate a Mill that makes money), it is clear that Stimson will suffer significant and severe harm if a preliminary injunction is not granted.

Specifically, if Stimson is evicted from the Mill, it will have to lay off employees. Those laid-off workers will not wait around for the Tribe and Stimson to resolve their fight—they will go look for work elsewhere. Stimson will also lose customers and supplies because Stimson will be unable to fill their orders in a reliable, prompt manner—if at all. Stimson will lose contracts with timber sellers because the sellers will prefer to sell their goods to more stable buyers. If Stimson is evicted and later wins the litigation but does not have any employees, customers, sellers, and its land has been changed by the Tribe in its absence, Stimson will have won only a devastating Pyrrhic victory. While the Tribe claims that money damages can remedy all of Stimson's harms in the event Stimson wins, this is

---

[12] The only cases cited by the Tribe involving a landlord-tenant relationship were *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) and *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). However, unlike the instant case, neither *Goldie* nor *L.A. Memorial Coliseum Commission* involved a property ownership interest.

MEMORANDUM DECISION AND ORDER - 15

not true because land is unique. *See Thomas v. Campbell*, 107 Idaho 398, 405 (1984) ("The basic premise underlying the remedy of specific performance in land transactions is the uniqueness of land, as distinguished from chattels"). In short, this is not a case in which a bell can be unrung. Therefore, the strong likelihood of irreparable injury weighs in favor of granting a preliminary injunction.

### E. Balance of Equities

A party seeking a preliminary injunction must establish that the balance of equities weighs in favor of an injunction; *Winter*, 555 U.S. at 20. When balancing the equities, the court should "balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Here, denying the preliminary injunction would significantly harm Stimson, as explained above. On the other hand, the Tribe will not suffer any significant damage if the preliminary injunction is granted. The Tribe claims that it will be injured because it cannot find a new tenant and will be forced to accept the current rent payments, which the Tribe claims are below market. The Tribe also argues that the harm to Stimson is of Stimson's own making because the parties have been engaged in negotiations for a new lease for two years. This may be so. Nevertheless, the Court finds the balance of equities cuts sharply in Stimson's favor. Refusing the preliminary injunction would shutter one of Stimson's mills, cause approximately 80 employees to be laid off, and cut into the limited national supply of wood products. It may also lead to Stimson losing its rights to exercise its Purchase Option and wrongfully losing its land. While the

Tribe may not receive as high a monthly rent as it could with a different tenant, the Tribe will continue to profit by receiving several more months of rent as the litigation process unfolds. Additionally, it is unclear (because Stimson owns the equipment inside the Mill), that the Tribe could actually find a tenant in short order. Moreover, even if the Tribe can find a new tenant before the end of litigation, a victory for Stimson would require the Court to evict a different tenant from the Mill. Finally, when the Court was preparing to issue its decision on the preliminary injunction, the Tribe filed a Motion to Dismiss. The Tribe should have been aware that such a filing could further delay the Court's decision on the preliminary injunction, and appears not to have been overly concerned with remedying its injury by evicting Stimson as quickly as possible. As such, the balance of equities weighs in Stimson's favor.

### F. Public Interest

Finally, a party seeking a preliminary injunction must establish that an injunction is in the public interest. *Winter*, 555 U.S. at 20. "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (cleaned up). As the dispute is between two private parties, the impact on non-parties is rather limited. However, what public impact there is cuts in favor of Stimson. The Covid-19 pandemic has made a wreck of supply chains, and this has led to an increased demand, and decreased supply, of forest products. Virginia McDaniel, *A Supply, Demand Primer*, COMPASSLIVE (Jun. 9, 2022), https://www.srs.fs.usda.gov/compass/2022/06/09/a-supply-demand-primer/. Allowing a factory to shut down would be a blow to the wood supply in

MEMORANDUM DECISION AND ORDER - 17

the United States. Perhaps more importantly, shutting down the factory would put roughly 80 employees out of work. It is not hard to assume that many of those employees have a family, and that those families will be in some financial trouble if the Mill is closed. Conversely, denying the preliminary injunction would not harm any non-parties. Although the Tribe is a governmental entity with members who rely on programs funded by the rent profits, granting a preliminary injunction would only preserve the current rate of monthly payments, not end them. As such, the public interest weighs in favor of granting the preliminary injunction.

## V. CONCLUSION

Findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). This is because a preliminary injunction is generally issued "in the early stages of litigation, when the record is insufficiently complete to allow a reliable resolution of the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). As the Ninth Circuit has explained, a preliminary injunction, "is not a preliminary adjudication on the ultimate merits: it is an equitable device for preserving rights pending final resolution of the dispute. The district court is not required to make any binding findings of fact; it need only find probabilities that the necessary facts can be proved." *Id.* at 1423.

As such, when a federal district court has granted a preliminary injunction, the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy. *Camenisch*,

451 U.S. at 396. Although the Court finds Stimson satisfies the elements of a preliminary injunction based on the record currently before it, this finding may change once the Tribe has the full opportunity to present its case—whether on summary judgment or at trial—and receives a final decision on the actual merits. This finding may also change based on the Court's order involving the pending Motion to Dismiss.

Here, although both sides have raised serious questions about their respective positions, Stimson has demonstrated that it has a reasonable likelihood of success on the merits. Stimson has also demonstrated an extreme likelihood of an irreparable harm. Indeed, the harm of losing the mill, employees, and orders that can be prevented here is a prototypical harm that preliminary injunctions seek to avoid. The balance of equities tips sharply in Stimson's favor, as does the public interest.

In *Cottrell*, the Ninth Circuit specifically held that district courts may issue preliminary injunctions in cases when there are "serious questions going to the merits" (as there are here), and where the "balance of hardships . . . tips sharply towards the plaintiff" (as it does here) as long as the other two factors are met (which they are). Additionally, granting a preliminary injunction would preserve the current status quo, a status quo which has lasted since 2000, and only recently became unpalatable to the parties. This is preferable, safer, and less intrusive than allowing the eviction to occur, especially if the Court later decides that Stimson properly exercised its Purchase Option.

Therefore, the Court GRANTS Stimson's Motion for Preliminary Injunction (Dkt. 3).

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. Stimson's Motion for Preliminary Injunction (Dkt. 3) is **GRANTED**.

2. The Tribe and its agents are **ENJOINED** from terminating the Agreement, from evicting Stimson from the Mill property and premises, and from interfering in any way with Stimson's ability to possess, access, and operate the Mill.  The status quo, including Stimson's Holdover Tenancy and rental payments to the Tribe, must continue during the pendency of this litigation.

DATED: July 28, 2022

_____
David C. Nye
Chief U.S. District Court Judge